**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MARVIN CARTER, | ) |
| | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| | ) |
| | ) |
| v. | ) Case No. 17-3690 |
| | ) |
| | ) |
| JOHN R. BALDWIN, TIM | ) **JURY DEMANDED** |
| CHAMBERLAIN, CHRISTOPHER R. | ) |
| BARNHART, LISA MINTER, SHERRY | ) |
| BENTON, LASHARD CAMERON, JANET | ) |
| WHEAT, MAX BLACKBURN, and | ) |
| WEXFORD HEALTH SOURCES, INC. | ) |
| | ) |
| | ) |
| *Defendants*. | ) |
| | ) |
| | ) |

## COMPLAINT

Plaintiff Marvin Carter asserts the following claims against Defendants John R. Baldwin, Dr. Tim Chamberlain, Lisa Minter, Sherry Benton, Lashard Cameron, Janet Wheat, Christopher R. Barnhart, Max Blackburn, and Wexford Health Sources, Inc. ("Wexford"). Pursuant to 42 U.S.C. § 1983, Mr. Carter alleges Defendants Baldwin (in his official capacity as Acting Director of the Illinois Department of Corrections), Chamberlain, Minter, Benton, Cameron, Wheat, Barnhart, Blackburn and Wexford, all of whom were acting under color of State law, deprived him of his rights and privileges while he was incarcerated in Dixon Correctional Center ("Dixon"), an Illinois state prison under the supervision of the Illinois Department of Corrections

(the "Department" or "IDOC"). Pursuant to the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.) and the Rehabilitation Act (29 U.S.C. § 701 et seq.), Mr. Carter alleges he is a qualified person with a disability and that Defendant Baldwin (in his official capacity as Acting Director of the IDOC) denied him access to Dixon's programs and activities because of his disability. Finally, Mr. Carter alleges that Defendants Chamberlain and Minter intentionally inflicted emotional distress on him while he was incarcerated at Dixon.

## PRELIMINARY STATEMENT

1.      Plaintiff Marvin Carter, who has been deaf and mute since the age of two, is fluent in American Sign Language ("ASL"). ASL is his best—and, in many situations, only—effective means of communication.

2.      Mr. Carter also suffers from sickle cell disease, a hereditary blood disorder for which he requires careful monitoring and treatment. Due to this serious disease, Mr. Carter is consistently at risk for various acute and chronic complications, many of which have rapid onset. Some of these complications are potentially fatal. In order to ensure that he receives care adequate to prevent or combat sickle cell crises, Mr. Carter requires an ASL interpreter to convey information about complex topics related to his medical needs. Defendants were fully aware that Mr. Carter has been diagnosed with sickle cell disease and required ASL interpreters.

3.      Mr. Carter was incarcerated in Dixon, a medium security prison in Dixon, Illinois within the IDOC, from mid-2015 to January 2017. Yet, Defendants failed to reasonably accommodate Mr. Carter's disability. Specifically, despite Mr. Carter's repeated requests, a recommendation by the prison's Americans with Disabilities Act ("ADA") Coordinator, and Defendants' own frequent acknowledgement that interpreters were necessary, the Defendants denied Mr. Carter adequate access to ASL interpreters while he was at Dixon.

4.      As a result of Defendants' deliberate indifference to Mr. Carter's serious medical needs and their failure to provide him reasonable disability accommodations, Mr. Carter suffered severe physical and emotional harm while at Dixon.  For example, because of his sickle cell disease, Mr. Carter developed leg ulcers, which necessitated daily bandage changes and wound dressings.  Mr. Carter often experienced extreme pain during these bandage changes, as Defendant Minter and others would roughly scrub or otherwise manhandle the ulcer and the sensitive surrounding area.  Because Mr. Carter was not permitted an interpreter to communicate with the medical staff at Dixon during these dressing changes, he was unable to adequately signal to the nursing staff his discomfort or suggest ways to minimize the pain.  In short, Mr. Carter was forced to endure excruciating treatments on a daily basis due to the inadequate accommodation for his disability. This resulted in both physical injury and severe emotional distress.

5.      On at least two occasions, the Defendants' deliberate indifference, coupled with Defendant Baldwin's failure to provide Mr. Carter with reasonable access to interpretive services to facilitate his medical care, resulted in severe medical emergencies.  First, in May 2016, Mr. Carter repeatedly approached the Dixon medical staff to communicate that he was experiencing an unusual amount of pain and worsening symptoms indicative of sickle cell crisis.  His outreach was ignored.  By the time he was finally transferred to the University of Illinois at Chicago ("UIC") medical center, his health had deteriorated.  Mr. Carter remained hospitalized for more than a week.  A second crisis, ignored by Defendants until Mr. Carter was completely non-responsive, also resulted in hospitalization in November 2016.  If Defendants had not acted with deliberate indifference, these crises could have been mitigated or avoided altogether.  Defendant Baldwin's failure to reasonably accommodate Mr. Carter's disability compounded these issues.

These crises also reflect Defendants' Chamberlain's and Minter's intentional infliction of emotional distress.

6.     In addition, Defendant Baldwin's failure to provide interpreters excluded Mr. Carter from IDOC programs available to hearing prisoners and prevented him from receiving proper medical care.  Mr. Carter was not permitted to participate in educational programs because of his disability.

7.     Defendants' acts and omissions, which are described in more detail below, violate the ADA, the Rehabilitation Act, and the Eighth and Fourteenth Amendments to the Constitution of the United States.  They also constitute infliction of emotional distress under Illinois state law.

## DEFENDANTS

8.     Defendant John R. Baldwin has been Acting Director of the IDOC since in or around August 2015 and is responsible for day-to-day operations of the IDOC.  Mr. Baldwin is sued in his official capacity.

9.     Defendant Dr. Tim Chamberlain was an M.D. responsible for treating Mr. Carter during his stay at Dixon.

10.     Defendant Lisa Minter was a nurse who treated Mr. Carter during his stay at Dixon.

11.     Defendant Sherry Benton is a member of the Administrative Review Board of the IDOC, who, upon information and belief, reviews final institutional decisions on inmate grievances.

12.     Defendant Lashard Cameron was involved with Dixon's educational programs.

13.     Defendant Janet Wheat was Principal of Dixon's educational programs.

14.     Defendant Christopher A. Barnhart was an ADA Coordinator at Dixon for all or part of Mr. Carter's time there.

15.     Defendant Max Blackburn was an ADA Coordinator at Dixon for all or part of Mr. Carter's time there.

16.     Defendant Wexford Health Sources, Inc. ("Wexford") contracts with the State of Illinois for the provision of health care services to persons in the custody of the IDOC.  On information and belief, Wexford employed Defendant Chamberlain (and potentially other Defendants) at all relevant times.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because: (1) this action arises under the Constitution and laws of the United States, pursuant to 28 U.S.C. § 1343(a)(3); (2) Plaintiff alleges that he has been aggrieved by an act or failure to act by a recipient of Federal assistance under 29 U.S.C. § 794; (3) Plaintiff alleges discrimination on the basis of disability in violation of 42 U.S.C. § 12132; and (4) Plaintiff alleges that Defendants deprived him of his rights, privileges, or immunities secured by the Constitution and Federal laws.

18.     In addition, under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Mr. Carter's state law claim because it is so related to his federal claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

19.     On information and belief, Defendants Chamberlain, Minter, Benton, Cameron, Wheat, Barnhart and Blackburn are individuals who live and work in and for the State of Illinois. Defendant Baldwin is the Acting Director of an Illinois agency, the IDOC.  Wexford is a corporation incorporated under the laws of Florida, with a principal place of business in Pittsburgh, which is registered and authorized to do business in the State of Illinois.   All Defendants have sufficient contacts with Illinois for this Court to exercise personal jurisdiction over them.

20.     Venue is proper within this district pursuant to 28 U.S.C. § 1391(b)(1) and (2), because one or more of the Defendants reside in this district and a substantial part of the acts and omissions giving rise to the claims occurred in this district.

## BACKGROUND

**A.     Defendants were deliberately indifferent to Mr. Carter's medical needs and failed to accommodate his disability.**

21.     From the beginning of Mr. Carter's time at Dixon, Defendants were aware that he was deaf and mute.  It was thus clear to Defendants that Mr. Carter required interpreters to facilitate medical treatment, which Defendants regularly denied.

22.     Worse still, the Defendants exhibited deliberate indifference to Mr. Carter's pain and to the other complications caused by his sickle cell disease—even though Mr. Carter regularly alerted the Defendants to his symptoms, suffering and worsening condition.

23.     The harmful effects of the Defendants' deliberate indifference were compounded by the Defendants' failure to provide Mr. Carter an ASL interpreter during medical treatment.

*i.    The Defendants were aware of Mr. Carter's serious medical needs.*

24.     Although there is no cure for most people who have sickle cell anemia, proper treatment can help prevent the problems it causes, including the attendant pain.  Prior to his incarceration, Mr. Carter received blood transfusions as a course of treatment for his sickle cell disease.  Blood transfusion therapy is believed to reduce the risk of complications of sickle cell disease and to reduce symptoms of severe anemia.  Mr. Carter continued to require treatment for his sickle cell disease, including blood transfusions, when he entered the care of Defendants. Defendants Chamberlain, Minter, Benton, Barnhart, Blackburn, Wexford and Baldwin were aware of this fact.  For example, according to his medical records, on December 17, 2015, Mr.

6

Carter provided a "note from a family member stating he should be getting monthly blood transfusions for sickle cell."

25.     Painful, recurring, and slow-healing leg ulcers are common among individuals with sickle cell disease.  As Defendants Chamberlain, Minter, Benton, Barnhart, Blackburn, Wexford and Baldwin were also aware, Mr. Carter had numerous ulcers on his legs and feet that required regular wound care when he entered the care of the IDOC.

26.     Treatment of sickle cell disease and its symptoms and side effects is a complex proposition.  Mr. Carter thus required ASL interpreters to communicate with the Dixon medical staff to ensure that he received the medical care he needed.  Without adequate disability accommodations, Mr. Carter would be unable to communicate his needs to the medical staff, to inform the staff when their treatments of his disease were inadequate or causing him pain, and to understand the self-treatment and care that the medical staff was trying to communicate to him.

> ii.  *Mr. Carter repeatedly sought interpreters and requested adequate medical care.*

27.     Mr. Carter frequently alerted Defendants and others at the prison both to his need for adequate medical care and to his need for an interpreter.  Accordingly, he made requests to the prison's ADA Coordinator—then Defendant Barnhart—for accommodations.  Although he made his first request in May 2015, it was not until October 14, 2015 that the ADA Coordinator first met with Mr. Carter.

28.     Mr. Carter also filed many grievances.  For example, Mr. Carter filed a grievance on October 7, 2015, writing:

> **Could I please have a Deaf and Hard of Hearing Communication plan that is in the Department of Corrections rule book[.]**  I'm Deaf and can't speak or hear[.]  I need a Interpreter for sign language, a walker, hearing aids[.]  I need all this because I have an emergency on my ankle[.]  My wounds are

> getting [bigger] instead of healing and ***the doctors and nurses
> cannot communicate with me or I with them and I'm suffering in
> pain all the time.*** (emphasis added)

His request was straightforward: "To get some help as soon as possible because I'm in extreme pain all the time."

29.     Other grievances highlighted the Defendants' deliberate indifference to the pain they were causing Mr. Carter by improperly dressing his wounds. For example, Defendant Minter repeatedly used a dressing technique that caused Mr. Carter excruciating pain. Accordingly, in another grievance, dated January 13, 2016, Mr. Carter wrote that he needed an interpreter to tell them "not to put this type of type or any tape against the bare skin, because it cause[s] pain."

30.     Mr. Carter submitted another grievance on January 18, 2016, writing: "I have told the nurses that the tape they use for my dressing change hurts real bad when it is removed. I told Nurse - Ms. [Minter] three times and she ke[pt] putting the same tape on my feet. When she pulls it off she snatches it off and hurts me everytime." He explained that the tape "pulls my skin and causes a lot of pain." He again specifically highlighted his request for accommodation: "I am deaf so the nurse can not understand me. ***I need an interpreter***." (emphasis added)

31.     Nothing changed. Mr. Carter continued to submit grievances. For example, on July 14, 2016, Mr. Carter submitted a grievance that stated that he had "told this Nurse and all the others every day that [he] need[ed] a[n] interpreter" yet "[o]ne still has not been provided."

32.     As another example, on August 4, 2016, Mr. Carter submitted a grievance describing Defendant Minter's conduct, writing:

> On 8-3-16, I went to the dispensary to have the dressings changed
> on both my ankles which is done every morning, 7 days a week
> between 8:15-9:30. On this morning, while I was on the dressing
> table after Nurse [Minter] cut off my bandages Dr. Chamberlin

came in and looked at the infection in both of my ankles and legs. *After the Doctor left, Nurse [Minter] started acting angry toward me by wiping my wounds so hard that I screamed.* I indicated to her that she was [too] hard. Then she got this cream in a white and blue tube spelled Miconazole. *I indicated 'no' and 'it burn.' She brushed me off. I indicated again, but she started to put that cream on me anyway.* So I pulled my legs up to keep her from putting on anymore. She grabbed me by both ankles and snatched my feet to her. hurting me. She held one ankle real tight so I couldn't pull away, and she slapped the cream on my ankle and started rubbing my wound real strong. *I yelled again it burn, it burn, it hurt.* She grabbed the other one and did the same thing. I cried because it hurt and burn so bad. *This nurse is cruel to me always and don't care about how much pain she causes me.* This has been a[n] ongoing situation with this nurse. (emphasis added)

33.     Mr. Carter's grievances went as high as the IDOC's Administrative Review Board.  Defendant Benton, a member of that Board, demonstrated deliberate indifference to Mr. Carter's serious medical needs by refusing to take action in light of the serious issues and medical needs raised by those grievances.

34.     Mr. Carter also frequently used other means to communicate to Defendants Chamberlain, Minter, Barnhart, Blackburn, Wexford and Baldwin that he needed interpreters and adequate medical care.  For example:

- **August 22, 2015:**  Per medical records, "[inmate] nonverbal[,] motioning for nurse to pat sores + Ø rub."[1]

- **January 13, 2016:**  Medical records state that Mr. Carter indicated to Defendants that he was "deaf and unable to effectively communicate needs."

- **June 7, 2016:**  Mr. Carter was "[w]aving hands trying to direct at this nurse + officer how to do the dressing," according to his medical records.

- **June 9, 2016:**  Mr. Carter's message to Defendants, as reflected in his medical records:  "The wounds keep getting bigger. . . . I want

---

[1] On information and belief, at least Defendants Baldwin, Chamberlain, Minter and Wexford had access to Mr. Carter's medical records, which are referenced throughout this Complaint.

to speak with Dr. Chamberlain about the cream used on wounds with sign language interpreter."

- **June 24, 2016:** Mr. Carter submitted an "Offender Request" slip to Defendant Blackburn, writing: "Could you please fulfill my ADA plan and get me an interpreter[.] I can't communicate with sick call nurse[.] I have medical need[s] to be take[n] care of[.] Thank you very much."

- **July 1, 2016:** According to medical records, Mr. Carter was "[m]aking painful gestures [complaining of] legs hurting."

- **July 7, 2016:** In an "Offender Request" slip addressed to specifically Defendant Blackburn, Mr. Carter again requested the presence of an interpreter.

- **July 11, 2016:** Mr. Carter filled out an "Offender Request" to Defendants, writing: "I need to see Dr. Chamberl[a]in (emergency)[.] My ankles and legs hurt real bad and the infections are getting worse in both of them. I need a[n] interpreter to explain."

- **August 1, 2016:** In an "Offender Request" slip, Mr. Carter wrote: "The infections on my Ankles are getting wider and deeper spreading to my feet in 3 days and hurt real bad. It's serious. I need interpreter to explain for me."

- **August 2, 2016:** Mr. Carter submitted an "Offender Request" slip plainly stating: "I need a sign language interpreter to assist me when I go to sick call and when I see the Doctors, so I can understand what is going on, and so that med staff can understand me. I've as[k]ed the Doctor 4 times already for one."

- **August 24, 2016:** Per his medical records, Mr. Carter was "requesting sign interpreter."

- **October 27-28, 2016:** Medical records state: "Pt. pointing to back + making painful expression. . . . Pt. is nonverbal, holding stomach, heart and kidney area, squinting in pain."

> *iii. Defendants intentionally failed to provide Mr. Carter reasonable accommodation.*

35.     Defendants expressly recognized that interpreters were necessary. In response to

Mr. Carter's January 18 grievance requesting interpreters during even routine medical

appointments, the prison's ADA Coordinator (then Defendant Barnhart) recognized that Mr. Carter must be provided this accommodation. Specifically, on March 10, 2016, Defendant Barnhart explained that "[a]ccording to Administrative Directive 04.01.111, communication accommodations may be requested when 'the information being relayed is complex, exchanged for a lengthy period of time, or involves legal due process. This may include, but is not limited to, communications such as medical and mental health services.'" Accordingly, Defendant Barnhart directed that Mr. Carter be provided "interpreter services when the aforementioned medical services are being provided." On March 29, 2016, the Chief Administrative Officer concurred.

36. But nothing changed. Defendant Barnhart made no effort to implement his direction that interpreters be provided but rather willfully ignored the continually failure to provide these services. And, with only limited exceptions, Defendants refused to provide ASL interpreters during Mr. Carter's medical treatment as directed. In fact, of the hundreds of meetings with doctors and nurses at Dixon (including scheduled meetings), an ASL interpreter was present at only a handful.

37. The absence of an ASL interpreter meaningfully diminished the quality of Mr. Carter's medical care. When an interpreter was present, medical records show Mr. Carter was able to convey nuanced information, and Dixon medical staff was able to tell Mr. Carter how to best to address his problems. When an interpreter was not present, the medical records reflect little information going back and forth between Mr. Carter and the Defendants, such as: "Non verbal-patient showed fingers pain scale 10/10."

38.     As a result, Mr. Carter did not get the information he needed to manage his own condition.  For example, on June 20, 2015, Mr. Carter did not receive his medication because an interpreter was not present to adequately explain the process for requesting it.

> *iv. Defendants intentionally withheld medical care to Mr. Carter out of deliberate indifference and because of his disability.*

39.     Numerous times, Defendants Chamberlain, Minter, Wexford and Baldwin caused Mr. Carter to go without treatment for an extended period of time.  For example, on May 22, 2015, Mr. Carter's medical records note he was suffering from pain in his ankle but admit: "[Inmate] not seen.  [Inmate] need to utilize sign-language interpreter."  For three days, Mr. Carter was not treated, purportedly for lack of an interpreter.

40.     As another example, on July 15, 2016, Mr. Carter was forced to submit a grievance because he had twice been denied medical treatment within the span of a week on account of the lack of an interpreter.  In his grievance, he wrote that on July 6, 2016 he "went to sick call for [his] serious medical issues" but Defendant Minter refused to see him "because she said we have no Interpreter for the deaf."  On July 11, 2016, Mr. Carter "went back to sick call for the same issues." This time, he came armed with a "request slip" stating "'I need to see Doctor'."  Again, Defendant Minter refused to treat him, citing the lack of an interpreter.

41.     Similarly, on August 4, 2016, Mr. Carter submitted a grievance describing another instance in which he was denied medical care for lack of an interpreter:

> "On 8-3-16 I went to sick call. When it was my turn and I came down the hallway to enter the Nurse Office, ***'Officer Hanraban' stopped me and said 'you again, aint no interpreter.'  He put his foot on the back of my wheelchair and shoved it with his foot real hard.***  This is the second time this c/o shoved me in my wheelchair and been cruel to me. ***I didn't even get to see the Nurse for my serious medical needs.***  I have Sickle Cell Anemia and very bad infections in both my ankles, that are very painful and won't heal. This c/o interfered with my rights under the ADA to receive

medical care, and my right to be free of cruel and unusual punishment, *from this c/o [whose] actions in effect denied me medical services and treatment because I have a disability*. Also, this is the *third time in August that I have requested a interpreter to [no avail], so I can understand and comprehend what the medical staff mean, and so that they can fully understand me*." (emphasis added)

42.     Further, as discussed below, Defendants prevented Mr. Carter from receiving blood transfusions necessary to treat his sickle cell disease.

43.     In denying treatment to Mr. Carter, Defendants Chamberlain, Minter, Benton, Barnhart, Blackburn, Wexford and Baldwin exhibited deliberate indifference to his medical needs and discriminated against him on the basis of his disability.

*v.   The Defendants' acts and omissions harmed Mr. Carter.*

44.     The harmful effects of the Defendants' deliberate indifference and failure to accommodate his disability manifested themselves in several ways.

45.     For one, Defendant Minter's approach to cleaning and dressing his wounds caused Mr. Carter unnecessary pain and emotional trauma.

46.     Also, Mr. Carter's ulcers expanded dramatically, becoming larger and more painful throughout his time at Dixon.

47.     In addition, because of Defendants' acts and omissions, Mr. Carter suffered two sickle cell attacks while he was in the care of Dixon.  Both required hospitalization.  Both left him near death.

48.     The first attack—which Mr. Carter's medical records described as an "all over sickle cell crisis"—occurred in May 2016.  This attack resulted in nearly two weeks of hospitalization at the University of Illinois at Chicago ("UIC") medical center.  While at UIC, Mr. Carter was given blood transfusions for the first time since he arrived at Dixon.  As his

discharge summary from UIC succinctly noted, Mr. Carter's health markedly improved when he was given blood transfusions.  Immediately upon returning to Dixon on May 28, Mr. Carter told medical staff:  "'I am good.'"

49.  In contrast, back under Defendants' care, his condition soon worsened. As Mr. Carter indicated to Defendants (per his medical records), "my legs are worse the infection is spreading wide and deeper."  And:  "My wound is worse."

50.  As his condition worsened, Mr. Carter repeatedly alerted Defendants to his need for regular blood transfusions.  For example, on July 22, 2016, Defendant Chamberlain wrote in Mr. Carter's medical records:  "Pt stopped me in hall [and] gave me note that he thinks he needs blood transfusions."  Similarly, on July 27, 2016, Mr. Carter's medical records state:  "Pt asking to go to hospital for transfusion to help wounds heal."  Nonetheless, the Defendants still refused him blood transfusions.

51.  In October 2016, Mr. Carter had another sickle cell attack.  Defendants acknowledged the crisis at least as early as October 27, 2016.  Yet, by October 29, Mr. Carter was still at Dixon.  Early that morning, Defendants observed Mr. Carter "grimacing" and "squinting in pain."  Still, they did not take him to the hospital.

52.  Hours later, in the late afternoon, Mr. Carter was found non-responsive in his wheelchair.  Per medical records, Mr. Carter "did not respond to verbal, touch" or other stimuli, his respiration was "shallow and labored," and he was "unable to hold head or torso upright."  Only after observing that Mr. Carter "***still [did] not respond to painful touch***" did Defendants send Mr. Carter to the hospital.  (emphasis added)

53.  Although he survived, Mr. Carter remained hospitalized off-site for more than a week.

**B.      Defendants Expelled Carter From Educational Programs Due To His Disability.**

54.      After arriving at Dixon, Mr. Carter learned that Dixon offers some inmates educational programs.  In order to participate, Mr. Carter required a sign-language interpreter. Defendants Baldwin, Cameron and Wheat intentionally discriminated against Mr. Carter on the basis of his disability, refusing to provide one.

55.      Mr. Carter filed multiple grievances requesting interpreters so he could participate in educational programs.  For example, on April 6, 2016, he requested an interpreter for his schooling, writing that the Defendants' failure to accommodate his needs was "stopping me from making positive moves in my life and to better myself with education."

56.      Nonetheless, in May 2016, Defendants informed Mr. Carter he could no longer participate in Dixon's educational programs.

57.      In a May 19, 2016 "Offender Request" slip to Defendant Blackburn requesting an interpreter for his medical care, Mr. Carter reiterated his request for an interpreter for schooling, writing: "PS, plus I want to go to school."  Mr. Carter submitted an "Offender Request" slip to Defendant Blackburn on June 13, 2016 following up on his request:  "I would like to know where my interpreter?  You said a long tim[e] ago I would have one.  I want to go back to school."

58.      Mr. Carter filed another grievance on June 26, 2016. In this grievance, he requested an "interpreter for the hear[ing] impaired be hired so I can attend school."  Mr. Carter explained:  "I was in school, but as a person with hearing impairment, I have been suspended and not allowed to attend school anymore because the IDOC has not hired an interpreter. I have been discriminated against because of being a young African American male with a disability."  And he wrote:  "I want and need to learn so I can better myself and further myself."

15

59. On July 7, 2016, Mr. Carter submitted another "Offender Request" slip to Defendant Cameron. This request stated: "I wrote [Defendant] ADA Coordinator Max Blackburn and Principal Mrs. Sheets. . . . I'm hearing impaired . . . I have not gotten my help . . . to further education."

60. On information and belief, Defendant Cameron ignored this request.

61. In addition, and on information on belief, Defendant Wheat ignored all such requests.

62. On July 13, 2016, Mr. Carter filed another grievance, stating: "On approx. June 13-16, 2016, I was kicked out of school because there is no Interpreter for the deaf. As a result, I am prevented from earning Good-time. I want to attend a school to rehabilitate myself and make better. This is outright discrimination to me as an African American prisoner with disabilities."

63. On August 21, 2016, Mr. Carter submitted an "Offender Request" requesting a sign-language interpreter for school, writing: "This is my first time in prison. I haven't been able to earn good-time from school because there is no sign language interpreter. Please put me in for 90 days or more of good-time. Thank you."

64. Mr. Carter's grievances and requests were denied. Because of Defendant Baldwin's, Cameron's and Wheat's intentional discrimination, Mr. Carter was never provided an interpreter for his education. He was therefore unable to ever return to Dixon's educational programs, much less complete them.

## C. Other effects of Defendants' actions.

65. Because Mr. Carter is deaf, he could not hear the oral announcements and alarms—such as those about meals and emergency notifications—provided to hearing prison inmates. Accordingly, Mr. Carter required another system, such as a buzzer, for these notifications. Yet, as late as November 29, 2016, Defendants' records stated "NEEDS AN

ALERT WATCH!!"  Defendants' intentional failure to accommodate Mr. Carter's disability for all or part of his time at Dixon caused Mr. Carter harm.  This, despite the fact that Mr. Carter explicitly requested this safety measure; for example, in an "Offender Request" slip dated June 13, 2016 he wrote: "I need a watch to help me know when it time for meals, etc."

66.     In addition to those impacts specifically described above, the Defendants' deliberate indifference and intentional discrimination because of his disability caused Mr. Carter other injuries as well.  In these and other ways, Mr. Carter was injured by the Defendants' actions and omissions during his time at Dixon.

**D.     Exhaustion**

67.     Mr. Carter exhausted all administrative remedies available to him through all of the available avenues of Dixon's internal grievance process.

**CLAIMS FOR RELIEF**

**<u>COUNT I</u>**
**Violation of the American with Disabilities Act**
**(Defendant Baldwin in his official capacity as Acting Director of the IDOC)**

68.     Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth herein.

69.     Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S. § 12132.

70.     Defendant Baldwin is Acting Director of the IDOC, a public entity, as a department, agency, special purpose district, or other instrumentality of the State of Illinois, as defined in 42 U.S.C. § 12131(1).

17

71.     Defendant Baldwin is Acting Director of the IDOC, which receives federal financial assistance.

72.     Plaintiff is a qualified individual with a disability within the meaning of Title II of the ADA, 42 U.S.C. § 12131(2), and has a right not to be subjected to discrimination on the basis of their disability by Defendant Baldwin.  42 U.S.C. § 12132.

73.     Individuals in the custody of IDOC such as Plaintiff are wholly dependent on IDOC for medical and educational services, among other services.

74.     The U.S. Department of Justice ("DOJ") regulation implementing Title II of the ADA requires the provision of effective communication, including "auxiliary aids and services" such as "qualified interpreters."

75.     Plaintiff requires a qualified interpreter in order to effectively communicate. Plaintiff required a qualified interpreter to participate in educational programs and to receive adequate medical treatment.

76.     Despite Plaintiff's repeated requests, and Defendants' acknowledgement that one was necessary, Defendant Baldwin failed (among other failures) to provide qualified interpreters necessary for, *inter alia*, Plaintiff's medical treatment and participation in Dixon's educational programs.

77.     Defendant Baldwin intentionally discriminated against Mr. Carter on the basis of his disability.

78.     Defendant Baldwin intentionally failed to give consideration to Plaintiff's requests, denying his requests for accommodations which would enable equal access to services, benefits, activities, programs, and privileges available to hearing inmates in IDOC's custody.

79.     As a proximate result of Defendant Baldwin's violations of Plaintiffs' rights under the ADA, Mr. Carter suffered from discrimination, unequal treatment, exclusion from services, benefits, activities, programs, and privileges, violations of his rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, trauma, embarrassment, and injury to his health.

80.     Defendant Baldwin's failure to comply with the ADA has resulted in harm to Mr. Carter, and Defendant Baldwin, in his official capacity as Acting Director of the IDOC, is liable to Mr. Carter for harms suffered.

81.     As a direct and proximate cause of Defendant Baldwin's failure to comply with the ADA, Mr. Carter has suffered economic damages, in an amount to be determined by a jury.


## COUNT II
### Violation of the Rehabilitation Act
### (Defendant Baldwin, in his official capacity as Acting Director of the IDOC)

82.     Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth herein.

83.     The purpose of the Rehabilitation Act is to ensure that no "qualified individual with a disability in the United States . . . shall, solely by reason of [] disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

84.     Plaintiff is a qualified individual with a disability within the meaning of the Rehabilitation Act. 29 U.S.C. § 705(2).

85.     Plaintiff has a right not to be subjected to discrimination on the basis of his disability. 29 U.S.C. § 794(a).

86.     Defendant Baldwin is Acting Director of the IDOC, which receives federal financial assistance within the meaning of 29 U.S.C. § 794(a).

87.     Defendant Baldwin is Acting Director of the IDOC, which is "program or activity" within the meaning of 29 U.S.C. § 794(b)(1)(a)-(B) and/or (b)(2)(B), and which is required to comply with the Rehabilitation Act.

88.     The DOJ regulation implementing the Rehabilitation Act clarifies that correctional facilitations must provide "appropriate auxiliary aids," including "qualified interpreters." 28 C.F.R. § 42.503(f).

89.     Defendant Baldwin violated the Rehabilitation Act by intentionally denying Plaintiff, on the basis of his disability, the same access to services, benefits, activities, programs, and privileges—including access to adequate healthcare services and educational programs—provided to hearing individuals.

90.     Defendant Baldwin also violated the Rehabilitation Act by intentionally and discriminatorily impairing Plaintiff's ability to communicate effectively with medical personnel and educators by failing to provide appropriate auxiliary aids and services.

91.     Plaintiff requires a qualified interpreter in order to effectively communicate. Plaintiff required a qualified interpreter to participate in educational programs and to receive adequate medical treatment.

92.     Despite Plaintiff's repeated requests, and Defendants' acknowledgement that one was necessary, Defendant Baldwin failed (among other failures) to provide qualified interpreters necessary for, *inter alia*, Plaintiff's medical treatment and participation in Dixon's educational programs.

93.     As a proximate result of Defendant Baldwin's violations of his rights under the Rehabilitation Act, Mr. Carter has suffered from discrimination, unequal treatment, exclusion from services, benefits, activities, programs, and requirements, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, trauma, embarrassment, and injury to his health.

94.     Defendant Baldwin's failure to comply with the Rehabilitation Act has resulted in harm to Mr. Carter, and Defendant Baldwin, in his official capacity of Acting Director of the IDOC, is liable to Mr. Carter for harms suffered.

95.     As a direct and proximate cause of Defendant Baldwin's failure to comply with the Rehabilitation Act, Mr. Carter has suffered economic damages, in an amount to be determined by a jury.

**COUNT III**
**Cruel and Unusual Punishment:**
**Violation of the Eighth and Fourteenth Amendments**
**(Defendants Baldwin, Chamberlain, Minter, Benton, Barnhart,**
**Blackburn and Wexford)**

96.     Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth herein.

97.     As an inmate in the custody of the Illinois Department of Corrections, Plaintiff had a right to be free from cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution, which was made applicable to the states by the Fourteenth Amendment.

98.     The rights Plaintiff alleges the Defendants violated are clearly established statutory and/or constitutional rights of which a reasonable person would have known.

99.     The treatment of Plaintiff by Defendants constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution.

100. Plaintiff's medical condition is so objectively serious that the failure to provide the needed care amounted to a constitutional deprivation.

101. Defendants possessed actual or constructive knowledge of the Plaintiff's serious medical condition.

102. Despite Defendants' actual knowledge of the substantial medical and safety risks Plaintiff faced while in their custody, they continually disregarded Plaintiff's medical and other needs in violation of the Eighth and Fourteenth Amendments of the U.S. Constitution.

103. On information and belief, Defendant Wexford maintains policies, practices, or customs, including cost-cutting policies, that caused the violation of Plaintiff's constitutional rights.

104. On information and belief, to the extent that Wexford does not maintain authorized policies regarding these deficiencies, they are widespread practices that, although unauthorized, are so permanent and well-settled that they constitute customs or usages maintaining the force of law. This is demonstrated by the series of bad acts that are outlined in greater detail above. Further, at all relevant times, Defendant Wexford maintained actual or constructive knowledge of these deficiencies and was deliberately indifferent to the known or obvious consequences that would result from the same.

105. In the alternative, the Constitutional violations alleged herein were caused by a policy, practice or custom of IDOC or by a decision made by an employee of the IDOC who had final decision-making authority.

106. The deprivation of Mr. Carter's rights secured to him by the Eighth and Fourteenth Amendment to the United States Constitution was inflicted under color of state law and pursuant to official IDOC policy, practices and procedures.

107.    Defendants acted with an evil motive and/or demonstrated reckless indifference to Plaintiff's constitutional rights.

108.    Defendants failure to comply with the Eighth and Fourteenth Amendments of the U.S. Constitution has resulted in harm to Plaintiff.

109.    As a direct and proximate result of Defendants' deprivation of Plaintiff's Eighth and Fourteenth Amendment rights, Plaintiff is entitled to compensatory and punitive damages under 42 U.S.C. § 1983.

**COUNT IV**
**Equal Protection:**
**Violation of the Fourteenth Amendment**
**(Defendants Baldwin, Chamberlain, Minter, Benton, Cameron,**
**Wheat and Wexford)**

110.    Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth herein.

111.    Under the Fourteenth Amendment of the United States Constitution, "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

112.    Defendants deprived Mr. Carter of his rights to equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution, by discriminating against him in their application of the laws of the state of Illinois.

113.    Defendants treated Mr. Carter differently from other Dixon prisoners and intentionally mistreated him because he is deaf and mute.

114.    Defendants' mistreatment and discriminatory intent was not rationally related to a legitimate state or penological interest.

115. Defendants' failure to comply with the Fourteenth Amendment of the United States Constitution has resulted in harm to Mr. Carter, and Defendants are liable to Mr. Carter for harms suffered.

116. The deprivation of Mr. Carter's rights secured to him by the Fourteenth Amendment to the United States Constitution was inflicted under color of state law and pursuant to official IDOC policy, practices and procedures.

117. Defendants acted with an evil motive and/or demonstrated reckless indifference to Plaintiff's constitutional rights.

118. On information and belief, Defendant Wexford maintains policies, practices, or customs, including cost-cutting policies, that caused the violation of Plaintiff's constitutional rights.

119. On information and belief, to the extent that Wexford does not maintain authorized policies regarding these deficiencies, they are widespread practices that, although unauthorized, are so permanent and well-settled that they constitute customs or usages maintaining the force of law. This is demonstrated by the series of bad acts that are outlined in greater detail above. Further, at all relevant times, Defendant Wexford maintained actual or constructive knowledge of these deficiencies and was deliberately indifferent to the known or obvious consequences that would result from the same.

120. In the alternative, the Constitutional violations alleged herein were caused by a policy, practice or custom of IDOC or by a decision made by an employee of the IDOC who had final decision-making authority.

121.    As a direct and proximate cause of Defendants' failure to comply with the Fourteenth Amendment of the United States Constitution, Mr. Carter has suffered economic damages, in an amount to be determined by a jury.

122.

## COUNT V
## Intentional Infliction of Emotional Distress
### (Defendants Chamberlain and Minter)

123.    Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth herein.

124.    As explained above, Defendants' conduct was extreme and outrageous. Specifically, with respect to each of Mr. Carter's two sickle cell attacks, Defendants knew that Mr. Carter was in need of immediate care but, through willful and wanton conduct, failed to act.

125.    Defendants knew that there was a high probability that their conduct—namely their failure to provide the medical assistance necessary to treat Mr. Carter's two sickle cell attacks—would cause Mr. Carter severe emotional distress.

126.    Defendants' conduct in fact caused Mr. Carter severe emotional distress, including extreme anxiety and fear.

### REQUESTS FOR RELIEF

WHEREFORE, for all of the reasons set forth in the foregoing paragraphs, Marvin Carter files this Complaint and requests the following relief:

*(i)*    Compensatory damages sufficient to compensate Mr. Carter for physical injury, pain, and suffering caused by Defendants as well as emotional distress and mental anguish;

*(ii)*    Punitive damages;

*(iii)*    Attorneys' fees; and

*(iv)*　　Interest, costs, and such other relief as this Court deems appropriate.

## JURY DEMAND

Mr. Carter, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury.

Date:   May 16, 2017                    Respectfully submitted,

                                        /s/ Karl Stampfl

                                        Nader R. Boulos, P.C.
                                        Britt Cramer
                                        Karl Stampfl
                                        KIRKLAND & ELLIS LLP
                                        300 North LaSalle
                                        Chicago, Illinois  60654-3406
                                        nader.boulos@kirkland.com
                                        britt.cramer@kirkland.com
                                        karl.stampfl@kirkland.com
                                        Telephone:    (312) 862-2000
                                        Facsimile:    (312) 862-2200

                                        *Attorneys for Plaintiff Marvin Carter*